ᵔᵉᵉ

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| NANCY MITCHELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 10 C 7464 |
| v. | ) |
| | ) Magistrate Judge Jeffrey Cole |
| CAROLYN COLVIN, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

The plaintiff, Nancy Mitchell, seeks review of the final decision of the Commissioner of the Social Security Administration ("Agency") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1382c. Ms. Mitchell asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

### I.
### PROCEDURAL HISTORY

Ms. Mitchell applied for SSI on June 26, 2007, alleging that she had been disabled since June 1, 2004 due to chronic back pain. (Administrative Record "R." 146). Her application was denied initially on September 7, 2007, and upon reconsideration on January 10, 2008. (R. 65-66). Ms. Mitchell then filed a request for a hearing on April 3, 2008. (R. 88).

An administrative law judge ("ALJ") convened a hearing on August 21, 2008, at which Ms. Mitchell, represented by counsel, appeared and testified. (R. 9-39). At the hearing, James Radke testified as a vocational expert. (R. 34-38, 120). At Ms. Mitchell's

1

request[1], a supplemental hearing was then held on June 2, 2009, at which Ms. Mitchell, represented by counsel, appeared, and Dr. Ronald Semerdjian testified as a medical expert. (R. 40-64). On September 24, 2009, the ALJ issued an unfavorable decision, denying Ms. Mitchell's application for SSI because she could still engage in light work subject to additional restrictions. (R. 67-78; *Infra*, at 11). This became the Commissioner's final decision when the Appeals Council denied Ms. Mitchell's request for review on September 24, 2010. (R. 1-3); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *see* 20 C.F.R. §§ 404.955, 404.981. Ms. Mitchell has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

Ms. Mitchell reapplied for SSI benefits approximately fifteen months after the ALJ handed down his decision. (*See* Memorandum in Support of Plaintiff's Motion for Summary Judgment, at n. 1) ("Plaintiff's Brief"). She was approved for benefits beginning December 2010. *Plaintiff's Brief*, at 1. Accordingly, the court will determine only whether Ms. Mitchell is eligible for benefits between her June 2007 application and her December 2010 application.

## II.
## THE RECORD EVIDENCE

### A.
### The Vocational Evidence

Ms. Mitchell was born on December 20, 1955, making her fifty-three years of age at the time of the ALJ's decision. (R. 9, 162). She completed high school and two years

---

[1] Ms. Mitchell's request for a supplemental hearing, while not providing a specific reason, seemed to stem from her inability to obtain and produce records of a 2001 MRI. (R. 199-200).

of college. (R. 172). Ms. Mitchell has not worked since 2002. (R. 168). Her last job involved providing full-time healthcare assistance to group home residents; the job is considered to be heavy, semiskilled work. (R. 34-35, 169). Prior to that, Ms. Mitchell held positions as a bus driver, caregiver, and office assistant. (R. 169).

## B.
## The Medical Evidence

### 1.
### The Plaintiff's Physician

Ms. Mitchell has experienced chronic back pain since 1997. (R. 168). The pain makes it difficult for her lift and carry objects and walk without occasional assistance. (R. 168). Ms. Mitchell also fractured her tailbone in 2002, and she has not worked since. (R. 168). Dr. Peter Kiefer, Ms. Mitchell's treating physician, diagnosed her with a herniated disc, fibromyalgia, and osteoporosis. (R. 383). Dr. Kiefer prescribed, and as of Ms. Mitchell's administrative hearing date, continued to prescribe, morphine sulfate and cyclobenzaprine to treat Ms. Mitchell's pain and muscle spasms, respectively. (R. 13, 172, 338, 385). In a 2008 written Medical Assessment, Dr. Kiefer submitted the following:

- Ms. Mitchell can stand or walk for two to three hours per workday, and sit for two to three hours per workday. (R. 384).
- Ms. Mitchell needs to lie down after one half hour of sitting or standing. (R. 384).
- Ms. Mitchell can occasionally carry ten pounds for a distance of fifty feet, and can frequently carry five pounds for a distance of one hundred feet. (R. 384).
- Ms. Mitchell has minimal ability to bend due to back pain, and minimal ability to manipulate objects due to arthritic hands and previous thumb fractures. (R. 384).

On June 6, 2009, Ms. Mitchell underwent an MRI at Resurrection Hospital. (R. 406). The imaging was interpreted by Dr. Renata Kesala, who listed her impression as "[m]ild to moderate discogenic disease of the lumbar spine most prominent at the levels of L3-L4 and L5-S1." (R. 407). In forming her impression, Dr. Kesala relied on findings

of mild diffuse disc bulging at L3 through S1, mild foraminal narrowing at L2 through S1, mild central canal narrowing at L3-L4 and L5-S1, and disc protrusion at L2-L3. The 2009 MRI was conducted after Ms. Mitchell's administrative hearings.

## 2.
## Consultative and Reviewing Physicians

On August 23, 2007, Ms. Mitchell underwent a consultative physical examination in connection with her application for benefits. (R. 356). Dr. Sandra Hare found that she was able to walk 50 feet without any support or difficulty, and that her range of motion in all joints was normal. (R. 359). Dr. Hare noted a decreased spinal range of motion and a mild muscular spasm in L2 through L5, but found no spinal deformities. (R. 358). Ms. Mitchell was uncooperative during the back exam, however she displayed an ability to squat down through bending at the knees. (R. 358). Ms. Mitchell also had no trouble getting on or off the examination table. (R. 359). She was also able to heel walk and toe walk without difficulties. (R. 359). Dr. Hare further reported that Ms. Mitchell's motor strength was 5/5 in upper and lower extremities. (R. 359). Ms. Mitchell's hand grip was also 5/5, and she had no trouble opposing her thumb to all fingers. (R. 359). Under the heading "clinical impression", Dr. Hare noted chronic low back pain with question of disc herniation, fibromyalgia, and probable prescription narcotic abuse. (R. 359).

Two non-examining State Agency physicians, Dr. Charles Kenney and Dr. David Mack, completed separate residual functional capacity ("RFC") assessments on September 4, 2007, and January 7, 2008, respectively, after reviewing Ms. Mitchell's file. (R. 361-68, 375-82). Both doctors' reports concluded that Ms. Mitchell was capable of occasionally lifting twenty pounds, frequently lifting ten pounds, standing and/or walking for about six hours in an eight hour work day, and sitting for about six hours in an eight-

4

hour workday. (R. 362, 376). Additionally, both doctors concluded that Ms. Mitchell had no postural limitations with respect to climbing, stooping, kneeling, or crouching, and no manipulative limitations with respect to handling or reaching. (R. 363-64, 377-78). Both physicians agreed in their disability determination transmittals that Ms. Mitchell suffered from degenerative and discogenic disorders of the back, but each found that she did not qualify for SSI benefits. (R. 65-66). Neither doctor's RFC assessment listed any debilitating limitations. (R. 361-68, 375-82). The physicians' conclusions were based on a review of Ms. Mitchell's medical history and Dr. Hare's consultative physical examination. (361-62, 375).

## C.
## The Administrative Hearing Testimony

### 1.
### The Plaintiff's Testimony

Ms. Mitchell testified that she experiences constant throbbing and aching in her lower back, with the pain often radiating down her left leg and spreading to between her shoulder blades. (R. 18-19). She attributed the pain to a herniated disc she suffered while vacuuming in 1997. (R. 18, 20). She stated that she would rate her pain to normally be 8/10. (R. 19). Ms. Mitchell also testified that she had osteoporosis and osteoarthritis in her spine, indicating that she has pain all over and that when someone tries to poke her in order to get her attention "it feels like they're hitting me with a baseball bat sometimes." (R. 31, 33). Yet, she indicated that no tests had been conducted to confirm this. (R. 33). Ms. Mitchell also explained that when she was a bus driver, she "snapped" her thumb backwards, requiring two surgeries and the insertion of two permanent pins. (R. 25). Ms. Mitchell stated that as a result of that injury and "arthritis starting to set in the fingers",

5

she does not have full use of her thumb and her fingers have become deformed. (R. 25, 29).

With regard to medication, Ms. Mitchell testified that she takes Flexeril daily for muscle spasms and 90 milligrams of morphine daily for pain management. (R. 14). She approximated that she had been on morphine for four to five years, and while the medication managed her pain at first, it no longer was effective. (R. 14, 29). Ms. Mitchell testified that prior to the morphine, she was taking almost 300 Vicodin per month for four to five months. (R. 29, 30). Ms. Mitchell explained that she visits her personal physician, Dr. Kiefer, monthly in order to obtain the morphine prescription. (R. 13). She stated that Dr. Kiefer does not typically examine her during these visits, and that he sees her on a charitable basis due to her lack of health insurance. (R. 13, 14). Ms. Mitchell also testified that due to her pain, she regularly counts the hours before she can take her next morphine or Flexeril dose. (R. 16-17). When the ALJ asked Ms. Mitchell whether Dr. Kiefer had ever ordered an MRI, she answered in the affirmative, explaining, however, that when they went to conduct the test she "freaked out in the machine" and could not complete it. (R. 28).

Regarding her daily activity level, Ms. Mitchell estimated that she drives two or three times per week. (R. 11). She testified that she does not do much else, as she frequently falls asleep during the day. (R. 28, 30). Ms. Mitchell testified that she can sit uninterrupted for between fifteen minutes and one hour, and can stand uninterrupted for fifteen minutes. (R. 17). She stated that she can walk one block before resting, and that she has to lie down three to four times per day. (R. 17). Ms. Mitchell also testified that in order to walk, she needs the assistance of a cane once or twice per month, and the

assistance of a walker approximately twice per year. (R. 12). She said that while she may have a good day once or twice a week, she did not believe she could work even on those days because it's never guaranteed "that it will stay a good day." (R. 32).

## 2.
## Vocational Expert's Testimony

At the hearing, the ALJ asked James Radke, the Vocational Expert (VE), to consider an individual with the same education and work experience as Ms. Mitchell, but with the limitations of only occasional bending, squatting, or twisting. (R. 35). The VE stated that such limitations would preclude Ms. Mitchell from working in her previous capacity as a group home worker, but she could still perform jobs like laundry worker, mail clerk, courier, and food prep worker. (R. 35). The ALJ then told the VE to consider the added hypothetical limitation of only being able to "use the dominant right upper extremity to handle, hold and reach occasionally." (R. 36). The VE replied that such an additional limitation would preclude the laundry worker, mail clerk, and food prep worker jobs, with the only remaining job being a courier. (R. 35). The ALJ then told the VE to consider a third limitation, that is an individual who required cane assistance one to three times per month. (R. 36). The VE responded that such an additional limitation would likely eliminate the courier position, leaving no available jobs. (R. 36).

The VE also testified that an individual who required lying down for four to five times per day to relieve pain would be left with no available jobs. (R. 36-37). The VE stated that the same would be true for any individual who was functional one day out of every month, or in the alternative, was off task for ninety percent of the work day while counting time between medication doses. (R. 37). The VE then went on to explain that in

7

competitive unskilled jobs, there is little flexibility for a worker to take unscheduled and recurring breaks. (R. 38).

### D.
### Supplemental Administrative Hearing Testimony

Dr. Semerdjian, the testifying medical expert, testified that he did not believe any single impairment or group of impairments found in Ms. Mitchell would meet a listing to qualify her for SSI benefits. (R. 51, 53). Dr. Semerdjian explained that his conclusions resulted from a review of Ms. Mitchell's medical records and examinations that yielded no objectively verifiable medical condition. (R. 50, 52, 59-60). Ms. Mitchell's medical history revealed an x-ray of the spine that was relatively normal and electro-diagnostic studies that showed no neuropathy or plexopathy. (R. 47, 51). While her medical record referenced a previous MRI administered in California, the relevant documentation of the test was absent. (R. 51).

Dr. Semerdjian testified that Ms. Mitchell's previous diagnoses of osteoporosis, fibromyalgia, and a herniated disc, were all unsupported by her medical history. (R. 47, 59). First, Ms. Mitchell's bone density scan was consistent with osteopenia rather than osteoporosis, the difference being that osteopenia indicated some thinning of the bone, but not to the extent seen in osteoporosis. (R. 47-48). Second, while Ms. Mitchell's medical history referenced a diagnosis of fibromyalgia, no doctor had ever made a proper diagnosis. (R. 59-60). Dr. Semerdjian explained that the American Neurologic Society laid out guidelines for making a proper fibromyalgia diagnosis, requiring that thirteen specific "trigger" points on the patient be tested, eleven of which must test positive before a diagnosis can be made. (R. 59-60). The doctor testified that it appeared as if Ms. Mitchell "walked in [to a doctor's office] and said I just hurt all over, and they said

you've got fibromyalgia." (R. 61-62). Finally, Dr. Semerdjian explained that while Ms. Mitchell's medical history referenced a herniated disc, there was no documentation of such a condition. (R. 50).

When asked by the ALJ whether the ALJ should give substantial weight to the opinion of Dr. Kiefer as Ms. Mitchell's treating physician, Dr. Semerdjian replied "I cannot find documentation in his examinations to support what he's saying . . . ." (R. 56-57). Dr. Semerdjian indicated that Dr. Kiefer's medical notes did not consistently focus on any single area of the body but rather during each visit it appeared as if he was just writing down what Ms. Mitchell had told him. (R. 58). The absence of any thorough examination by the treating physician therefore led Dr. Semerdjian to conclude that there was a lack of support for Dr. Kiefer's medical conclusions. (R. 58).

Dr. Semerdjian further noted that Dr. Hare's consultative physical examination of Ms. Mitchell was "the most complete document[ed] examination in the chart", indicating that it should receive substantial weight. (R. 49). He pointed out that Dr. Hare's findings stood in contrast to Dr. Kiefer's and indicated a lack of debilitating limitations. (R. 49-50). Dr. Semerdjian testified that Dr. Kiefer's conclusion that Ms. Mitchell had limited function in her hand stood "in sharp contrast to what Dr. Hare had mentioned in her examination where she talked about using the fingers . . . ." (R. 50). Dr. Semerdjian also pointed out that Dr. Hare's consultative examination revealed that Ms. Mitchell's reflexes and sensations were normal, implying that she did not have limitations that Dr. Kiefer concluded. (R. 55). Dr. Semerdjian noted that Ms. Mitchell should "be able to function in the absence of pain and weakness, she should be able to function in a relatively normal way." (R. 55). When the ALJ asked Dr. Semerdjian to explain why then Dr. Kiefer would

prescribe the high doses of morphine, Dr. Semerdjian stated that he could not answer the question. (R. 53). He also noted that the morphine itself may have debilitating side effects, and that the prescription was unusual for a patient with fibromyalgia or lower back pain in the absence of a documented neurological finding. (R. 50, 52).

While Dr. Hare's consultative examination listed "question of disc herniation" and "fibromyalgia" under the Doctor's "impressions", Dr. Semerdjian testified that he did not believe these were actually her diagnoses. (R. 60-61). He stated, "I don't know that she's confirming or negating it. She's simply saying, you know, [Ms. Mitchell] walked into my office and said she had fibromyalgia. [Dr. Hare is] making the assumption that someone along the line made the diagnosis, and she put it down, but she has not done anything in her note to confirm the diagnosis." (R. 61). While Dr. Hare did report the presence of muscle spasms, Dr. Semerdjian indicated that such evidence was not alone sufficient for those diagnoses. (R. 59-60).

Finally, Dr. Semerdjian stated that he would not conclude based on the medical evidence that Ms. Mitchell was malingering with respect to her pain, and he noted that psychological factors could also be at play. (R. 62-63).

### III.
### THE ALJ'S DECISION

The ALJ found that Ms. Mitchell had not engaged in substantial gainful activity since her application date of June 13, 2007. (R. 72); *see* 20 C.F.R. § 416.971. He also found that Ms. Mitchell suffered from osteopenia and degenerative disc disease of the lumbar spine. (R. 72); *see* 20 C.F.R. § 416.920(c). The ALJ reasoned, however, that the impairments or a combination of the impartments did not meet or medically equal one of the listed impairments required for a finding of "disabled". (R. 73). Based on his review

of the entire record, the ALJ concluded that Ms. Mitchell retained a maximum RFC for light work as defined in 20 C.F.R. § 416.967(b). Her RFC, however, was subject to additional restrictions: she could only occasionally bend, squat, and twist, and she needed to work on level surfaces. (R. 73). Based on these findings and the VE's testimony, the ALJ concluded that there were jobs in significant numbers in the economy that Ms. Mitchell could perform. (R. 77). The ALJ therefore found that Ms. Mitchell was not disabled under section 1614(a)(3)(A) of the Social Security Act. (R. 78).

The ALJ determined that Ms. Mitchell's claim of fibromyalgia was not well supported by the record, as no doctor had ever made a proper diagnosis according to the criteria established by the American Board of Rheumatology. (R. 72). Further, the ALJ found that despite Ms. Mitchell's repeated claims that she suffered from a herniated disc, her June 2009 MRI showed that this was not the case. (R. 72). In finding that Ms. Mitchell did not have an impairment or combination of impairments that met one of the "Disorders of the Spine" listings, the ALJ noted that Ms. Mitchell's physical examination and post-hearing MRI did not display the stenosis, nerve root compression, or "the very specific neurological findings (motor weakness, sensory or reflex loss, atrophy, etc.) required" to constitute a disability. (R. 73).

The ALJ also found that while Ms. Mitchell's impairments could reasonably be expected to cause her alleged symptoms, her statements regarding the intensity, persistence, and limiting effects were not fully credible because they were inconsistent with the objective medical evidence and the RFC assessments. (R. 73-74). The ALJ stated that Ms. Mitchell's 2009 MRI revealed only "mild diagnostic findings" that "tend to belie claims of the chronic, debilitating and worsening severity that the claimant has

described." (R. 74). Additionally, he pointed out Ms. Mitchell's possible drug seeking behavior and her history of aches and pains in the absence of any definite etiology. (R. 74, 75).

The ALJ also determined that Ms. Mitchell's claims of debilitating symptoms stood in sharp contrast to the findings of Dr. Hare, the consultative examiner. (R. 74). While the examination revealed a mild muscular back spasm and decreased lumbar range of motion, Ms. Mitchell displayed full joint range of motion, an unrestricted ability to walk including heel and toe walk, full hand grip, and an ability to oppose her thumbs to all of her fingers. (R. 74). Additionally, Ms. Mitchell's reflexes, strength, and gait were all normal, and she had no difficulty getting on and off the examination table. (R. 74). The ALJ stated that Dr. Hare's examination, therefore, "allows the inference that [Ms. Mitchell's] impairments reasonably would not be expected to cause symptoms of the intensity, restriction, and frequency that she asserts." (R. 74).

In addition to Dr. Hare's consultative evaluation, the ALJ gave significant weight to the opinions of consulting physicians Dr. Kenney and Dr. Mack. (R. 76). Both physicians' opinions were also consistent with that of the testifying doctor, Dr. Semerdjian. (R. 76). The ALJ reasoned that the doctors' findings supported the conclusion that Ms. Mitchell's impairment could be accommodated with typical work breaks and that she would not be required to lie down on a regular basis during the work day. (R. 76). Additionally, while Ms. Mitchell's pain medication might cause drowsiness or concentration issues during the workday, the ALJ determined that there was "no objective basis for prescribing such high doses of narcotic medication." (R. 76).

Finally, the ALJ assigned little weight to the medical opinions of Ms. Mitchell's treating physician, Dr. Kiefer. (R. 75-76). He reasoned that Dr. Kiefer did not run diagnostic tests, and his medical records contained merely general and conclusory statements. (R. 76). Additionally, many of his findings were inconsistent with the objective medical evidence. (R. 76).

Given Ms. Mitchell's RFC for a limited range of light work, the ALJ found that she was unable to perform any past relevant work. (R. 76); *see* 20 C.F.R. § 416.965. The ALJ then relied on the testimony of the VE to find that there were jobs that existed in significant numbers in the national economy that Ms. Mitchell could perform. (R. 77); *see* 20 C.F.R. § 416.969. Based on the VE's testimony, the ALJ determined that Ms. Mitchell was capable of making an adjustment to work that existed in significant numbers. (R. 77). Through this determination, the ALJ concluded that Ms. Mitchell was not disabled as defined by the Social Security Act. (R. 77); *see* 20 C.F.R. § 416.920(g).

# IV.
# DISCUSSION

## A.
## The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir. 2008) (citing *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). The court may not reweigh the evidence or substitute its judgment for that of the Social Security Administration. *Berger,* 516 F.3d at 544; *Binion on Behalf of Binion v.*

13

*Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for her decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 516 F.3d at 544; *Eichstadt v. Astrue*, 534 F.3d 663, 665–66 (7th Cir. 2008).

14

## B.
## Five–Step Sequential Analysis

Section 423(d)(1) defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Heckler v. Day*, 467 U.S. 104, 107 n. 1, 104 S.Ct. 2249, 81 L.Ed.2d 88 (1984); *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

> 1) Is the plaintiff currently unemployed;
> 2) Does the plaintiff have a severe impairment;
> 3) Does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
> 4) Is the plaintiff unable to perform her past relevant work; and
> 5) Is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. § 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351–52 (7th Cir. 2005); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. § 404.1520; *Stein*, 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352.

## C.
## Analysis

Ms. Mitchell advances three arguments for reversal or remand. First, she argues that the ALJ "played doctor" by substituting his opinion for that of a qualified medical

15

expert. *Plaintiff's Brief*, at 10-12. Second, she claims that the ALJ improperly assessed Ms. Mitchell's complaints of pain. *Plaintiff's Brief*, at 12-13. Finally, Ms. Mitchell argues that the ALJ's decision is not supported by substantial evidence. *Plaintiff's Brief*, at 13.

Also, as a preliminary matter, Ms. Mitchell's subsequent reapplication and approval of SSI benefits is irrelevant to this court's determination. The reapplication came more than a year after the ALJ handed down his decision. *Plaintiff's Brief*, at n. 1. Further, the deferential "substantial evidence" standard we employ today, as noted, allows for reasonable minds to differ. *Binion*, 108 F.3d at 782. Accordingly, the court gives no weight to the Commissioner's disability determination upon reapplication.

1.

Ms. Mitchell first argues that the ALJ "played doctor" by substituting his opinion for that of a qualified medical expert when he found that Ms. Mitchell's post hearing MRI revealed mild to moderate abnormalities that did little more than undermine her claim. *Plaintiff's Brief*, at 10-12. Of course, an ALJ may not substitute his own judgment for a physician's without relying on other medical evidence in the record. *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). An ALJ, however, is not only allowed to, but indeed must, weigh the evidence and make appropriate inferences from the record. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). That is exactly what the ALJ did here. There was no need, as Ms. Mitchell asserts, for the ALJ to hold a second supplemental hearing, as the 2009 MRI presented little new information with regard to Ms. Mitchell's condition. The MRI revealed "mild to moderate discogenic disease of the lumbar spine". (R. 407). However, the ALJ alluded to and the plaintiff's brief indeed cites previous imaging tests that revealed similar, mild

16

abnormalities.[2] (R. 72); *Plaintiff's Brief*, at 5. Also, discogenic disease of the spine was listed by both Dr. Kenney and Dr. Mack in their respective Disability Determination Transmittals, and the ALJ assigned significant weight to both physicians' opinions. (R. 76). Even further, Dr. Semerdjian testified that there was no evidence of Ms. Mitchell's alleged osteoporosis and herniated disc, and the subsequent MRI confirmed that. (R. 8, 407).

Ms. Mitchell relies on *Maxwell v. Sullivan*, 792 F.Supp. 582, 593 (N.D.Ill. 1992), where the court stated that the Appeals Council "played doctor" when it determined that a CT scan was not new and material evidence that had a reasonable probability of changing the ALJ's decision that the claimant was not disabled. The ALJ had no opportunity to consider the CT scan, and in rendering his decision, he held that there was no objective evidence to establish that the claimant suffered from an impairment that could be expected to produce his alleged symptoms. *Id.* at 591.

This court, however, distinguished *Maxwell* in *Davis v. Astrue*, No 09-2883, 2010 WL 4876676, at 6 (N.D.Ill. 2010). The similarities between *Davis* and Ms. Mitchell's claim make the relevant provision worth quoting in full:

> "Here, [unlike in *Maxwell*], the ALJ *did* consider the EMG, and weighed it along with the report of Dr. Hare and the comments of the emergency room physician. Moreover, it is not as though all the ALJ had was raw EMG findings; he had the interpretation of a physician. . . Mr. Davis seems to suggest that the ALJ was obligated to have a medical expert review the EMG, in addition to the doctor who interpreted the results. But an ALJ is not required to consult a medical expert where the record is adequate to render a decision. *Skarbek v. Barnhart*, 390 F.3d 500, 504

---

[2] Ms. Mitchell was unable to provide the actual imaging from her 2001 MRI. However, her medical records make reference to an "outside MRI = DDD". (R. 248). Additionally, a 2000 spinal x-ray impression lists "no *significant* degenerative changes" and a 2001 spinal x-ray impression lists "no *significant* disk space narrowing." (R. 218, 220) (emphasis supplied).

(7th Cir. 2004); 20 C.F.R. § 404.1527(f)(2)(iii). Here, as already noted, the record was adequate."

Just as in *Davis* (and unlike in *Maxwell*), the ALJ considered the post hearing MRI, weighing it along with the opinions of no less than five medical experts.[3] (R. 74, 76). He clearly weighed the MRI when he stated that while it revealed discogenic disc disease, it did not display the necessary stenosis or nerve root compression necessary to equal a medical listing. (R. 73); *Davis*, 2010 WL 4876676, at 6; *see also, Clemons v. Barnhart*, 148 Fed.Appx. 541, 543 (7th Cir. 2005) (ALJ's unfavorable decision was proper where MRI revealed only "mild disc bulging and mild degenerative changes, but no significant spinal canal narrowing.")

Also identical to *Davis*, the ALJ was not supplied with raw results of Ms. Mitchell's MRI, but rather a diagnosis of mild to moderate discogenic disease by the physician who read and interpreted the MRI. (R. 407). Ms. Mitchell therefore wrongfully argues that the ALJ interpreted the MRI's "bare medical findings" and that he "disregard[ed] the full report" of the MRI. (*See* Plaintiff's Reply to Defendant's Motion for Summary Judgment, at 3) ("Plaintiff's Reply"). Because the ALJ made an informed decision on the basis of the interpreting physician's impression and the record as a whole, the ALJ did not play doctor. *Davis*, 2010 WL 4876676, at 6; *see also, Outlaw v. Astrue*, 412 Fed.Appx. 894, 898 (7th Cir. 2011) ("[T]he record contain[ed] little medical

---

[3] Both parties reference a "reasonable possibility test" established by *Davis* that mandates medical review if evidence would have a reasonable possibility of influencing the ALJ's decision. *Plaintiff's Reply*, at 4-5. Both parties confuse the relevant inquiry, however. The test is whether the evidence is new, material, *and then* whether it has a reasonable possibility of changing the ALJ's decision. *Davis*, 2010 WL 4876676, at 6. The evidence here was not new; the ALJ considered the MRI in his decision. Accordingly, our inquiry ends there.

evidence of back pathology, as reflected by the ALJ's citation to...[an] MRI showing only mild spinal disease.").

Ms. Mitchell urges this court to distinguish *Davis* on the basis of her older age[4] and her contrasting diagnosis.[5] *Plaintiff's Reply*, at 2. But it is not at all clear why these factual differences render the broader legal principal articulated in *Davis* inapplicable to Ms. Mitchell's claim and does not the plaintiff's argument require that we play doctor. We decline the invitation. Just as in *Davis*, here the MRI was fully considered by the ALJ after he was provided with a medical interpretation of the results, and, as noted, the record was more than adequate to render a decision on Ms. Mitchell's claim. (R. 72).

Ms. Mitchell's argument that the ALJ played doctor is unpersuasive.

**2.**

Ms. Mitchell next claims that the ALJ improperly assessed her complaints of pain. *Plaintiff's Brief*, at 12-13. It is well established that in the absence of a clear legal error, it is not the court's job to reweigh evidence taken into account by the ALJ. *Berger*, 516 F.3d at 544; *Binion*, 108 F.3d at 782. Further, this court will defer to the ALJ's credibility determinations provided that the ALJ gives specific reasons that are supported by the record. *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). "An ALJ's credibility determination is given 'special deference' and must be upheld unless the claimant shows it to be 'patently

---

[4] Ms. Mitchell was fifty three-years of age at the time of the ALJ's decision, while the plaintiff in *Davis* was thirty-one years of age. *Plaintiff's Reply*, at 2.

[5] Ms. Mitchell was diagnosed with discogenic disease of the spine, while the plaintiff in *Davis* was diagnosed with radiculopathy. *Plaintiff's Reply*, at 2.

wrong.'" *Clemons*, 148 Fed.Appx. at 543 (citing *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

Much of Ms. Mitchell's argument here mirrors the above discussion with regard to the 2009 MRI.[6] As noted, however, the ALJ properly weighed the MRI after receiving a complete diagnosis from the interpreting physician. (R. 72). The court will therefore not reweigh that evidence.

The ALJ was required to, and indeed did, provide specific reasons for questioning the alleged severity of Ms. Mitchell's pain. *See Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013) (citing *Murphy*, 496 F.3d at 634); *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). The ALJ properly reasoned that the MRI's relatively mild diagnostic findings several years *after* the alleged onset of pain undermined Ms. Mitchell's complaints of worsening plain. (R. 74); *See Clemons*, 148 Fed.Appx. at 543 ([claimant] contends that she was not exaggerating about her pain; but the MRI report characterized her condition as mild. . ."); *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) ("[T]he objective medical evidence consistently revealed only mild degenerative change, and the ALJ properly relied upon the discrepancy between the objective evidence and [the claimant's] self-reports."). Even further, the MRI revealed no disc herniation. (R. 72). Considering Ms. Mitchell's long history of claiming disc herniation, it was entirely reasonable for the ALJ to determine that the MRI undermined Ms. Mitchell's credibility with respect to the persistence and intensity of her pain. *See Jones*, 623 F.3d at 1161 ("'Although an ALJ may not ignore a claimant's subjective reports of pain simply

---

[6] "Since there was no expert assessment of the MRI as objective medical evidence, the ALJ's assessment of the pain which could be expected to result from the objective medical evidence was improper." *Plaintiff's Brief*, at 13.

because they are not supported by the medical evidence, discrepancies between the objective evidence and self-reports may suggest symptom exaggeration.'").

In addition to the evidence the post-hearing MRI presented, the ALJ properly determined that Ms. Mitchell's complaints of severe pain stood in sharp contrast to the findings of Dr. Hare's consultative examination. (R. 74-75). The ALJ noted that the examination revealed Ms. Mitchell's normal reflexes and range of motion, her ability to walk unassisted, and the probability that she was abusing prescription medication. (R. 74-75). The ALJ properly reasoned that these findings led him to question Ms. Mitchell's limitations and complaints of pain. (R. 74-75); *see Pepper v. Colvin*, 712 F.3d 351, 368-69 (7th Cir. 2013) (citing *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) ("[A] discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration.").

Ms. Mitchell's contention that the ALJ improperly assessed her complaints of pain is therefore unpersuasive.

3.

Ms. Mitchell's final argument is that the ALJ's decision is not supported by substantial evidence. *Plaintiff's Brief*, at 13. "Evidence is 'substantial' if it is sufficient for a reasonable person to accept as adequate to support the decision." *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).

Here, Ms. Mitchell first references Dr. Kiefer's willingness to provide her with morphine prescriptions for pain relief. *Plaintiff's Brief*, at 13. This argument, however, ignores the ALJ's discussion of Ms. Mitchell's possible drug-seeking behavior, which the ALJ reasoned by citing Dr. Hare's "probable prescription medication abuse" diagnosis

and Ms. Mitchell's previous treating physician who terminated his relationship with her after labeling her "high risk". (R. 74-75, 279). While such isolated incidents are not necessarily indicative of drug-seeking behavior, especially in the absence of a patient's manipulation or deception towards her doctors, *Kellems v. Astrue*, 382 Fed.Appx. 512, 516 (7th Cir. 2010), they nevertheless contribute to a long narrative that Ms. Mitchell's medication intake was, at the very least, excessive.[7] Dr. Semerdjian testified at the hearing that he was troubled by Ms. Mitchell's prescription intake and that while he was unsure whether or not Ms. Mitchell was abusing narcotics, "there is certainly some narcotic dependence." (R. 50, 53). The ALJ does not hang his hat on any definitive finding of narcotics abuse, but rather cites its excessiveness as implying "a basis for disability other than physical etiology." (R. 75). *See Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) ("Multiple physicians throughout the course of his treatment noted that Simila was overusing his pain medication and that such overuse might actually be causing some of his symptoms.").

Even ignoring the ALJ's discussion regarding possible drug-seeking behavior, Ms. Mitchell's argument regarding her morphine prescription is still unpersuasive. A treating physician's opinion is generally given controlling weight due to his "greater familiarity with the claimant's conditions and circumstances." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (citing *Whitney v. Schweiker*, 695 F.2d 784, 789 (7th Cir. 1982)). However, the ALJ "may discount a treating physician's medical opinion if it is inconsistent with the opinion of a consulting physician." *Skarbek*, 390 F.3d at 503 (citing

---

[7] The ALJ underscored the excessiveness of Ms. Mitchell's pain medication intake when he pointed out that at one time Ms. Mitchell was taking 300 Vicodin per month in the absence of any consistent medical oversight. (R. 75).

*Dixon*, 270 F.3d at 1178). Ms. Mitchell's treating physician's opinion was not only inconsistent with consulting physician Dr. Hare, but also with 1) Dr. Semerdjian as the testifying medical expert; 2) Dr. Kenney as the first State Agency consulting physician; 3) Dr. Mack as the second State Agency consulting physician, and; 4) the post-hearing MRI showing no disc herniation. (R. 72, 74-76). It was therefore entirely proper for the ALJ not to find conclusive Ms. Mitchell's morphine prescriptions and the diagnoses provided by her treating physician.

Furthermore, Ms. Mitchell testified at her hearing that her personal physician rarely examined her due to her lack of health insurance; he typically would only see her briefly to refill her pain prescriptions. (R. 13, 14). Dr. Semerdjian's testimony echoed this fact when he pointed out that Dr. Kiefer's notes rarely concentrated on a single part of the body, with it appearing as if he would merely jot down Ms. Mitchell's current complaints. (R. 58). "It would be exceedingly illogical to credit a doctor's opinion because he is *more likely* to have a detailed and longitudinal view of the claimant's impairments when *in fact, there is no detail or longitudinal view*. In other words, the very reasons the Social Security regulations set out for giving substantial weight to a treating physician's opinion are absent in this case." *Scheck*, 357 F.3d at 702-03 (emphasis in original) (citing *Powers*, 207 F.3d at 435.) The ALJ also explicitly asked Dr. Semerdjian whether he should credit the opinions of Dr. Kiefer as treating physician, and Dr. Semerdjian on several occasions indicated that he should not. Of course an ALJ must consider a patient's prescribed medications in making a disability determination, *Simila*, 573 F.3d at 517, but the overwhelming evidence here makes clear that the ALJ was proper in not providing controlling weight to Ms. Mitchell's excessive doses of painkillers. It must be recalled

that treating doctors often "'bend over backwards to assist a patient in obtaining benefits.'" *Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011). And, that is perhaps nowhere more prevalent than with an impecunious patient, like Ms. Mitchell, who the doctor treats without charge as a matter of human decency. Be that as it may, what is clear is that there is no principle of law that requires a judge to conclude that a person is disabled or presumptively disabled merely because the treating physician prescribed narcotics. Yet that is what implicitly is being argued by Ms. Mitchell's lawyer.

Next, Ms. Mitchell cites the VE's testimony that no jobs would exist for someone with Ms. Mitchell's claimed restrictions. *Plaintiff's Brief*, at 14. Of course, VE testimony holds no weight if it is in response to a hypothetical regarding a limitation that the claimant is found not to possess. *Page v. Barnhart*, 127 Fed.Appx. 885, 887 (7th Cir. 2005); *see Simila v. Astrue*, 573 F.3d 503, 520-21 (7th Cir. 2009). Ms. Mitchell's argument is thus unpersuasive, as the VE was merely responding to various hypotheticals—those that were later disproved—provided by the ALJ. (R. 35-36).

Contrary to Ms. Mitchell's contention, the ALJ's decision is entirely supported by substantial evidence. His decision echoed the findings of several medical experts, including consultative examining physician Dr. Hare, non-examining State Agency physicians Dr. Mack and Dr. Kenney, and testifying medical expert Dr. Semerdjian. (R. 74-76). The ALJ also provided sound reasoning for disregarding the opinion of treating physician Dr. Kiefer. (R. 74-76). The ALJ properly considered the findings of the 2009 MRI based on a diagnosis provided by the interpreting physician and compared that diagnosis with the testimony and medical records of Ms. Mitchell, and the previous findings of several medical experts. (R. 72-74, 406). The ALJ's reasoning therefore

24

provided a sufficient bridge between the medical evidence and his conclusion that Ms. Mitchell retained a maximum RFC for light work.

## CONCLUSION

The plaintiff's motion for summary judgment or remand is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

DATE: July 11, 2013

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE